IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:20-cr-04095-SRB |
| ) | |
| JEREMIAH EZEKIEL BROWN, ) | |
| ) | |
| Defendant. ) | |

## **REPORT AND RECOMMENDATION**

Pending before the Court is defendant Jeremiah Ezekiel Brown's Motion to Suppress Evidence. (Doc. 28). The Government has filed its response in opposition. (Doc. 30). No reply brief was filed and the time to do so has expired. The Court held a hearing on this matter on July 22, 2021. (Doc. 51). For the reasons that follow, it is recommended that the motion be DENIED.

### **I. Findings of Fact**

On the basis of the evidence presented at the evidentiary hearing, the Court submits the following proposed findings of fact.

#### **Investigation of Jeremiah Brown and Bridget Hartley**

1. Detective Chris Papineau has served with the Columbia Police Department ("CPD") for fifteen years. (Tr. 4:1-7). In 2020, he also was assigned as a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. (Tr. 4:10-15).

2. In fall 2020, Detective Papineau received information from a confidential informant ("CI") that Bridget Hartley was selling cocaine and marijuana that had been transported from Colorado to Missouri. (Tr. 6:14-17). Drug transactions were being conducted at her place of employment, Parkade Plaza in Columbia. *Id.* The CI alleged that Ms. Hartley kept the

drugs in her black backpack and was associated with a silver Chrysler Pacifica. (Tr. 6:14-19, 7:23-25, 8:1-2)

3. The CI had a multi-year history of providing truthful and reliable information that resulted in arrests and convictions. (Tr. 7:3-4, 19:23-25, 20:1-3).

4. The CI's information was corroborated by a federal defendant who provided information that Ms. Hartley was selling drugs on behalf of Mr. Brown. (Tr. 7:5-12).

5. On November 23, 2020, Detective Papineau and other law enforcement officers conducted surveillance of Mr. Brown and Ms. Hartley. (Tr. 7:23-25, 8:1-23). They observed Ms. Hartley leaving a residence carrying a black backpack, accompanied by Mr. Brown. (Tr. 8:2-23). They then tailed Mr. Brown and Ms. Hartley for approximately an hour and a half as the two traveled together in a silver Chrysler Pacifica to Ms. Hartley's mother's house, an address associated with Mr. Brown, and a convenience store. *Id.*

6. The silver Chrysler Pacifica had a dealer tag registered to Royal Motors as a license plate. (Tr. 9:16-23).

7. Detective Papineau was aware of a prior October 2020 incident concerning Mr. Brown and Royal Motors. (Tr. 39:15-23). The CPD had responded to a report of an abandoned vehicle with stolen license plates on Highway 40. (Tr. 11:13-17). Mr. Brown was at the scene when the CPD arrived. (Tr. 12:14-15). The police spoke to Royal Motors' owner who informed them that the vehicle was a personal vehicle he had loaned to Mr. Brown without plates. (Tr. 12:11-25, 13:1-12). When asked why he did not put Mr. Brown in a company vehicle, the owner stated that because of Mr. Brown's history, he would not put him in a company car. (Tr. 13:13-18).

## **The November 24, 2020 Traffic Stop**

8. On November 24, 2020, Detective Papineau and other law enforcement officers conducted surveillance at Parkade Plaza. (Tr. 8:24-25, 9:1-3). They saw Ms. Hartley exit and reenter the building multiple times over several hours, carrying her black backpack each time. (Tr. 9:5-10).

9. Mr. Brown picked Ms. Hartley up from Parkade Plaza in the silver Chrysler Pacifica. (Tr. 9:11-15).

10. Several officers followed the silver Chrysler Pacifica in marked and unmarked vehicles. (Tr. 18:3-7).

11. The weather conditions were rainy. (Tr 17:16; Gov't Exhibit No. 1).

12. According to Detective Papineau's testimony, as Mr. Brown left Parkade Plaza driving the silver Chrysler Pacifica, Detective Papineau observed that the silver Chrysler Pacifica had its windshield wipers activated but did not have its headlights on. (Tr. 17:12-18).

13. Government surveillance footage from a fixed-wing airplane confirms that the silver Chrysler Pacifica driven by Mr. Brown had its windshield wipers activated as it left Parkade Plaza. (Gov't Exhibit No. 3 at 00:32-00:46).

14. Detective Papineau suspected that the silver Chrysler Pacifica was unregistered and the Royal Motors dealer tags were not being used for business purposes. (Tr. 14:2-7)

15. The law enforcement officers involved in the surveillance communicated among themselves about the lack of vehicle registration and headlights usage. (Tr. 33:9-13; 74:2-15).

16. Detective Papineau instructed CPD detective Bradley Overton to stop the silver Chrysler Pacifica. (Tr. 32:12-15, 32:25, 33:1-13). Detective Overton documented in his report that

Detective Papineau instructed him to stop the silver Chrysler Pacifica because of a concern that the vehicle was not properly registered. (Tr. 56:22-25, 57:1-13).

17. Detective Overton was driving a marked patrol vehicle, with Detective Michael Kile riding as a passenger. (Tr. 45:13-16).

18. At the time Detective Overton initiated the traffic stop, it was raining, Detective Overton had his vehicle's windshield wipers on, and oncoming vehicles had their wipers and headlights on. (Gov't Exhibit No. 1 at 00:00-00:36).

19. Detective Kile observed that the silver Chrysler Pacifica's taillights were off, leading him to surmise that the headlights were off as well. (Tr. 70:12-18).

20. The government surveillance footage shows that the taillights of the silver Chrysler Pacifica – driven by Mr. Brown – were off at Parkade Plaza and Detective Overton's dashcam video shows that the taillights were off until moments before Detective Overton activated his siren. (Gov't Exhibit No. 3 at 00:36-00:42, Gov't Exhibit No. 1 at 00:15-00:30).

21. Detective Overton activated his emergency lights and siren. (Gov't Exhibit No.1 at 00:29). After continuing to drive for a short period, Mr. Brown pulled over in the silver Chrysler Pacifica. **(**Gov't Exhibit No.1 at 00:29-01:12**)**.

22. Mr. Brown had the windshield wipers activated when he pulled over for the traffic stop. (Gov't Exhibit No. 3 at 05:14-08:29).

23. The officers smelled marijuana when they exited their vehicle to approach the silver Chrysler Pacifica. (Tr. 54:5-9, 71:11-13).

24. Detective Overton guided Mr. Brown out of the silver Chrysler Pacifica and passed him to Detective Kile. (Tr. 53:7-12).

25. Detective Kile frisked Mr. Brown and found a firearm in his waistband. (Tr. 72:15-25).

26. A search of the silver Chrysler Pacifica revealed a firearm, marijuana, and cocaine. (Tr. 54:1-15).

## II. Discussion

Mr. Brown was indicted by a federal grand jury on a charge of Felon in Possession of a Firearm on December 2, 2020. (Doc. 13). Mr. Brown filed his Motion to Suppress Evidence on May 21, 2021, challenging the constitutionality of the traffic stop. (Doc. 28). Mr. Brown's motion challenges only the constitutionality of the stop, not the subsequent frisk or vehicle search.

### A. Legal standard

A traffic stop is reasonable under the Fourth Amendment if law enforcement has "reasonable suspicion that [a] vehicle or its occupants are involved in criminal activity." *United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999). Reasonable suspicion exists "when an officer is aware of particularized, objective facts which, taken together with a rational inference from those facts, reasonably warrant suspicion that a crime is being committed." *Id*. "While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) (internal quotation marks omitted). Whether reasonable suspicion existed at the time of the stop is a determination based on the totality of the circumstances. *Navarette v. California*, 572 U.S. 393. 397 (2014). The Eighth Circuit has characterized violation of vehicle registration statutes as criminal activity for purposes of the reasonable suspicion analysis. *See United States v. Sanchez*, 572 F.3d 475, 478 (8th Cir. 2009) (holding that a traffic stop was reasonable because law enforcement had reasonable suspicion the driver violated a state vehicle registration statute); *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005) (same).

Even if law enforcement has no reasonable suspicion of criminal activity, a traffic stop is still reasonable under the Fourth Amendment when officers have probable cause to believe the driver committed a traffic violation. *Whren v. United States*, 517 U.S. 806, 819 (1994). The Eighth Circuit has emphasized that this is a hardline rule. The seriousness of the violation does not factor into the analysis. *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993) ("It is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle."). Officers' subjective motivations do not factor into the analysis either. *Whren*, 517 U.S. at 819; *accord United States v. McLemore*, 887 F.3d 861, 864 (8th Cir. 2018) ("[I]f an officer has reasonable suspicion or probable cause to stop for a traffic violation, any ulterior motivation on the officer's part is irrelevant." (internal quotation marks omitted)). The only question that matters is whether officers had probable cause to believe a traffic violation of any kind occurred.

If multiple officers in communication with one another work together on an investigation, reasonable suspicion and probable cause are premised on their collective knowledge. *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001) ("Where officers work together on an investigation, we have used the so-called 'collective knowledge' theory to impute the knowledge of one officer to other officers to uphold an otherwise invalid search or seizure." (internal citation omitted)); *United States v. Chhunn*, 11 F.3d 107, 110 (8th Cir. 1993) ("To decide whether the police met the reasonable-suspicion standard, we look to all the circumstances and the collective knowledge of the officers involved in the stop."). Every officer need not have observed the relevant conduct or known the relevant facts. *Navarette*, 572 U.S. at 397 ("We have firmly rejected the argument that reasonable cause for an investigative stop can only be based on the officer's personal observation, rather than on information supplied by another person." (internal quotation marks omitted)); *United States v. Mora-Higuera*, 269 F.3d 905, 910 (8th Cir. 2001) (An officer "may rely on information provided by other officers as well as any information known to the team of officers

conducting the investigation." (quoting *United States v. Thomas*, 249 F.3d 725, 728 (8th Cir. 2001))). If an officer who has reasonable suspicion of criminal activity instructs other officers to conduct a stop, the traffic stop is lawful under the Fourth Amendment even if the officers conducting the stop are wholly unaware of the underlying facts. *United States v. Jacobsen*, 391 F.3d 904, 906-07 (8th Cir. 2004) (affirming denial of a motion to suppress because the agent who ordered the traffic stop had reasonable suspicion of criminal activity).

   **B. Law enforcement had reasonable suspicion that Mr. Brown was engaged in criminal activity.**

Mr. Brown maintains that law enforcement lacked "the requisite suspicion of criminal activity" to initiate the stop because "[l]aw enforcement did not observe Brown commit or engage in any criminal wrongdoing" and "had no information that would warrant a prudent person to believe that a crime was committed to justify the traffic stop." (Doc. 28 at 3-4). The Court recommends a finding that the traffic stop was, in fact, supported by reasonable suspicion that Mr. Brown violated state vehicle registration and license plate laws. *See Sanchez*, 572 F.3d at 478 (holding a traffic stop was reasonable because law enforcement had reasonable suspicion the driver violated a state vehicle registration statute); *Smart*, 393 F.3d at 770 (same).

Detective Papineau made a "rational inference" from "particularized, objective facts" that Mr. Brown could not lawfully operate a vehicle with Royal Motors dealer tags. *Bell*, 183 F.3d at 749 (stating that reasonable suspicion exists "when an officer is aware of particularized, objective facts which, taken together with a rational inference from those facts, reasonably warrant suspicion that a crime is being committed."). Detective Papineau was aware that the previous month, October 2020, Mr. Brown borrowed a vehicle from Royal Motors, the vehicle's owner told police the vehicle did not have license plates when he made the loan, and the vehicle bore stolen license plates when Mr. Brown was found with it off of Highway 40. (Tr. 11:13-17, 12:11-15, 13:10-12,

39:15-23). Detective Papineau also knew the owner of Royal Motors had said he would never allow Mr. Brown to drive a company vehicle. (Tr. 13:13-18). Further, Detective Papineau observed Mr. Brown driving the Chrysler on two consecutive days without taking it to Royal Motors, other businesses, or a maintenance facility, but using it to visit multiple residences, a convenience store, and Parkade Plaza. (Tr. 41:4-16, 8:5-23, 9:13-15). From those facts, Detective Papineau made a rational inference that Mr. Brown borrowed a vehicle with dealer tags for personal use or affixed dealer tags to a vehicle to which they did not belong. (Tr. 41:4-16). That inference gave rise to reasonable suspicion that Mr. Brown had violated Mo. Rev. Stat. §§ 301.130(5) (requiring vehicles to display their proper license plates), 301.020(1) (requiring owners to register their vehicles), or 301.560(7) (prohibiting the display of dealer plates on a vehicle loaned to others). Because Detective Papineau ordered the traffic stop based on reasonable suspicion of criminal activity, what the officers who conducted the stop observed or knew is immaterial to the reasonable suspicion determination. *See Jacobsen*, 391 F.3d at 906-07 (affirming denial of a motion to suppress because the agent who ordered the traffic stop had reasonable suspicion of criminal activity). The Court, therefore, recommends a finding that law enforcement met the "minimal, objective" threshold for "justification for an investigatory stop," such that the stop was supported by reasonable suspicion. *Fuse*, 391 F.3d at 929.

### C. Law enforcement had probable cause to believe Mr. Brown committed a traffic violation.

Mr. Brown maintains that "there was no probable cause to stop the vehicle for a traffic violation for not utilizing its headlights" because Detective Overton "made no mention of the Vehicle not having on its headlights as a justification for the traffic stop" and "no rain could be seen striking the Vehicle at the time of the traffic stop as documented by the officers' body cameras." (Doc. 28 at 4). Under Missouri law, a driver must use headlights "any time the weather

conditions require usage of the motor vehicle's windshield wipers to operate the vehicle in a careful and prudent manner." Mo. Rev. Stat. § 307.02(9). The Court recommends a finding that the stop was supported by probable cause to believe Mr. Brown violated this law.

The officers' testimony and dashcam video strongly indicate that Mr. Brown was, indeed, driving without headlights in the rain. Detective Papineau testified that he directly observed Mr. Brown driving the silver Chrysler Pacifica in the rain without headlights. (Tr. 17:12-18). Officer Overton's dashcam video shows that it was raining when they tailed Mr. Brown's vehicle, they had their windshield wipers on, and oncoming vehicles had their windshield wipers and headlights on. (Gov't Exhibit No. 1 at 00:00-00:36). Moreover, Detective Kile observed that Mr. Brown's taillights were off, from which he reasonably concluded that the headlights were off. (Tr. 70:12-18). Surveillance footage substantiates that Mr. Brown's taillights were off when he left Parkade Plaza and when he was being tailed by Detective Overton, until moments before Detective Overton activated his siren. (Gov't Exhibit No. 3 at 00:36-00:42, Gov't Exhibit No. 1 at 00:15-00:30). Accordingly, the Court recommends a finding that the officers had probable cause to initiate the traffic stop.

**D. The traffic stop was reasonable, even if pretextual.**

Mr. Brown argues that the traffic stop was unconstitutional because "the traffic stop was a pretext to search for drugs in that law enforcement lacked probable cause to initiate the traffic stop." (Doc. 28 at 5). Officers' subjective motivations have no bearing on whether a traffic stop is constitutional. *Whren*, 517 U.S. at 819; *McLemore*, 887 F.3d at 864; *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) ("An otherwise constitutional traffic stop is not invalidated by the fact that it was mere pretext for a narcotics search." (internal quotation marks omitted)). The Court recommends a finding that the stop was reasonable, irrespective of whether it was pretextual,

because the police had reasonable suspicion that Mr. Brown committed a crime and probable cause to believe Mr. Brown committed a traffic violation.

### III. Conclusion

For the foregoing reasons, IT IS RECOMMENDED that the District Judge, after making an independent review of the record and applicable law, enter an order DENYING Defendant Jeremiah Ezekiel Brown's Motion to Suppress Evidence.

Counsel are reminded that each party has fourteen (14) days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation that are accepted or adopted by the District Judge, except on the grounds of plain error or manifest injustice.

Dated this 30th day of July, 2021, at Jefferson City, Missouri.

Willie J. Epps, Jr.
United States Magistrate Judge